**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **LELA WALTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08-0536-CV-W-GAF** |
| | ) | |
| **CLARION MORTGAGE CAPITAL,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

Pending before the Court are Defendants Marie Ann Gunja ("Gunja") and Clarion Mortgage Capital, Inc.'s ("Clarion") (collectively "Defendants") Motions for Summary Judgment. (Doc. ##38, 40). Defendants argue they are not liable either because no principal/agent relationship existed or because the acts of their agents did not cause Plaintiff Lela Walter's ("Plaintiff") alleged damages. (Doc. ##39, 41). Plaintiff counters with facts she asserts create triable issues with respect to her claims and those defenses. (Doc. ##45, 47). For the reasons set forth below, Defendants' Motions for Summary Judgment are DENIED.

**DISCUSSION**

**I.     Facts**

*A. Procedural History*

On May 6, 2005, Daisy Rooks filed a Petition in the Circuit Court of Jackson County, Missouri. (Doc. #4, ¶1). Pursuant to a court order, Plaintiff, a 76-year-old widow, was joined as a plaintiff in that case with the filing of her First Amended Petition on September 1, 2005. *Id.* at ¶2. Plaintiff filed a Second Amended Petition to add a fourth defendant on August 6, 2006. *Id.* at ¶3.

1

On August 9, 2006, Plaintiff amended her petition again to add a claim under the Missouri Merchandising Practices Act. *Id.* at ¶4. The Third Amended Petition included specific allegations that Clarion accepted unlawful kickbacks from Michael Phelps ("Phelps") d/b/a KC Builders on November 10, 2004 in connection with a loan Plaintiff received from Clarion. *Id.* On March 1, 2007, Plaintiff's case was severed from the other plaintiffs' cases by court order. (Fourth Am. Pet. ¶43). Finally, on July 17, 2008, Plaintiff filed a Fourth Amended Petition. (Doc. #4, ¶5). The Fourth Amended Petition ("Am. Pet.") for the first time alleged claims under the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-17 ("RESPA"), against Clarion and Phelps in relation to the unlawful kickbacks. (Doc. #4, ¶5; Am. Pet. ¶¶31-35). The case was removed to this Court on July 25, 2008. (Doc. #1).

*B. Background and Gunja's Appraisal*

Plaintiff owns a house in Kansas City, Missouri located at 3733 Wayne. (Walter Dep. 19:10-25). She purchased the home from a friend on May 27, 2003 for about $450. *Id.* at 20:3-13; 21:15-22; 23:1-15. Before she could move into the home, Plaintiff needed some repairs to the property. *Id.* at 59:7-9. So, in October 2004, Plaintiff contracted with Phelps of KC Builders to make repairs and improvements. (Am. Pet. ¶¶6, 14). To finance the repairs and improvements, Plaintiff completed a credit application with KC Builders. (Walter Dep. 59:7-15; Am. Pet. ¶15). Plaintiff states Phelps told her he would arrange for someone from Clarion to call her. (Walter Dep. 59:16-24). Pursuant to Phelps' referral, Plaintiff hired Clarion as her mortgage broker by entering into a Mortgage Loan Origination Agreement. *Id.* at 4:22-5:21; Doc. #39, Ex. 5; Doc. #44, Ex. 13. Plaintiff executed a Uniform Residential Loan Application in which she sought a $23,000.00 loan with a fixed interest rate of 5.625%. *Id.* The loan and credit application, which Robert Hartman

2

("Hartman"), a loan originator with Clarion, presented to Plaintiff and Plaintiff signed prior to an appraisal, represented that the property had an estimated value of $45,000.00. (Doc. #39, Ex. B attached to Ex. 3; Doc.. #39, Ex. 6; Walter Aff. ¶10). Plaintiff later stated during her deposition that she had no personal opinion about the value of the property. (Walter Dep. 116:19-21).

Hartman sent a Request for Appraisal to Richard Morton ("Morton") that asked Morton to appraise Plaintiff's property for a "Cash-Out Refi." (Doc. #44, Ex. 1). The appraisal request form indicated a pre-appraisal estimated value of $45,000. *Id.* Gunja testified that at the time of Plaintiff's appraisal, Morton was an independent contractor who did work with Gunja Appraisals. (Gunja Dep. 28:5-13). Morton performed the appraisal on Plaintiff's property and opined that the property had a market value of $50,000.00 as of October 20, 2004. (Morton Dep. 59:5-11). Morton was not certified as an appraiser at the time of Plaintiff's appraisal but worked as an apprentice under Gunja. *Id.* at 19:24; Def. Ans. to 2nd Am. Pet. at ¶48. Gunja supervised Morton, reviewed his appraisal report of Plaintiff's property, signed off as a supervisory appraiser, and bears responsibility for Morton's appraisal reports conducted under her supervision. (Morton Dep. 19:24; Def. Ans. to 2nd Am. Pet. at ¶48; Gunja Dep. 10:10-11:14, 30:4-12). Gunja receives her standard $350 appraisal fee regardless of whether a loan closes. (Morton Dep. 74:23-75:6).

Gunja was unaware that KC Builders was involved in the transaction. (Gunja Dep. 9:17-21). Gunja had never heard of KC Builders or Phelps or had any communication with them. *Id.* at 43:19-44:3. Morton knew Phelps socially, but had no knowledge of KC Builders' contract with Plaintiff. (Morton Dep. 34:2-17, 48:5-13). Morton's only contact with Hartman and Clarion with respect to Plaintiff's loan was his receipt of the appraisal request form. *Id.* at 74:1-13. According to Morton, no consideration, money, or promises of future work beyond the $350.00 appraisal fee

3

was provided in exchange for his appraisal of Plaintiff's property. *Id.* at 54:21-55:7. Morton did conduct a lot of business with Hartman and had catered a Christmas lunch for Hartman for sending business his way. *Id.* at 12:10-20.

According to Plaintiff's contract with KC Builders, a furnace was to be installed at the property. (Doc. #44, Ex. 8). Plaintiff testified that there was no furnace in the home. (Walter Dep. 101:5-8). Morton's field notes prepared during his inspection of the property also state there was no furnace. (Morton Dep. 62:18-24; Doc. #44, Ex. 14). Nevertheless, the appraisal prepared by Morton stated the property was equipped with a forced air furnace in good condition. (Morton Dep. 61:16-22; Doc. #44, Ex. 2). Morton contended at his deposition that his field notes must have contained an error and that to the best of his recollection the property was equipped with a furnace. (Morton Dep. 62:25-63:21). Morton's appraisal stated the home's interior was in average to good condition. *Id.* at 59:12-60:23. One of Plaintiff's experts, Beverly Eastwood, states that she considered the property to be in poor condition in 2006, but that there was no way to determine the condition when Morton made his inspection in 2004. (Eastwood Dep. 48:10-49:9). Hartman testified that Morton appraised a lot of the homes that Clarion financed. (Hartman Dep. 17-19).[1]

---

[1]Plaintiff provides an affidavit from another of her designated experts in which the expert, Donald Gossman ("Gossman"), asserts to testify at trial that the actual fair market value of Plaintiff's property was $23,000 as of October 20, 2004 subject to completion of the repairs, alterations, and conditions. (Gossman Aff.). Gossman states his opinion is based on a review of Morton's appraisal and his own personal inspection of the property in November 2005. *Id.* He opines that Morton's appraisal was misleading and does not accurately reflect the property's value on October 20, 2004. *Id.* The affidavit refers to Gossman's C.V. setting forth his credentials, but no copy of the C.V. is provided for the record. *Id.*

Gunja requests that Gossman's affidavit be stricken from the record because it is conclusory and insufficient under Fed. R. Civ. P. 56(e). The record here shows Plaintiff can overcome summary judgment with or without Gossman's affidavit. While Gunja's request that Gossman's affidavit be stricken is DENIED, the Court did not consider Gossman's assertions in ruling on the instant summary judgment motions.

4

Underwriter Flagstar Bank approved a $23,000 loan at 5.625% based on Plaintiff's loan application and appraisal. (Doc. #41, p.7; DeBoest Aff. ¶13; Ebright Dep. 48:4-7, 49:2-5). Clarion funded Plaintiff's loan. (DeBoest Aff. ¶13). The loan closed on November 2, 2004. (Doc. #39, Ex. 12; Walter Dep. 4:22-5:21). After closing, Flagstar Bank purchased Plaintiff's loan. (DeBoest Aff. ¶2). Plaintiff intended to use the loan to pay for remodeling of her property, pay off debt, consolidate other debt, and pocket $5,200.31. (Wooding Dep. 185:18-186:22; Third Am. Pet. ¶125).

*C. Facts Relating to Clarion*

Clarion claims all 170 loan officers[2] it associates with in the Kansas City area are independent contractors who sign loan originator agreements. (DeBoest Dep. 11:4-14). The loan originator agreements set forth the loan officers' relationships with Clarion and state that the "[o]riginator is a commission based employee...." (Doc. #45, Ex. 1, p. 7). Clarion alleges their loan officers work without its supervision. (DeBoest Aff. ¶4). The loan originator agreements state that loan officers Hartman and Jeremy Bredwell's ("Bredwell") duties were "to solicit, originate, process and facilitate the closing and post-closing of residential real estate mortgage loans for and on Clarion's behalf and under Clarion's direction and control...." (Doc. #45, Ex. 1, p. 1). Clarion does not withdraw taxes from commissions paid to loan originators. (DeBoest Aff. ¶4). Further, Clarion provides the originators with Forms 1099 to file their annual tax returns and not with W-2 forms. *Id.*; Hartman Dep. 9:9-17. A Midwest region vice president for Clarion, Timothy DeBoest ("DeBoest"), alleges Clarion did not intend to create an employer-employee relationship with its loan originators. (DeBoest Aff. ¶4; DeBoest Dep. 8:17-23).

---

[2]The terms "loan officer" and "loan originator" are used interchangeably in this Order.

Clarion contracted with Hartman to act as a loan originator on June 25, 2004. (Doc. #41, Ex. F; DeBoest Dep. 13:6-9, 15:20-21). Hartman's loan originator agreement states the "[o]riginator shall be responsible for the nature of his/her business development efforts limited only by the ethical standard of performance specified in Section 2." (Doc. #41, Ex. F, p. 1). Hartman testified he and Bredwell formed an S Corp, Hartwell Mortgage Group, Inc. ("Hartwell Group"), to terminate their former employment with Superior Mortgage, work their own hours, and make more commissions. (Hartman Dep. 9:1-17, 10:3-22). However, when Hartman started with Clarion in 2004, Hartwell Group did not have its own license to broker loans in Missouri; Hartman understood that he was personally licensed to originate loans under Clarion. *Id.* at 11:8-12:22. Hartman testified that he was a loan originator before he joined Clarion, that he already knew how to originate and process loans when he joined Clarion, and that he joined Clarion so he would have the ability to work on his own. *Id.* at 8:6-20, 9:1-6, 131:10-24. Bredwell entered a similar written loan originator agreement with Clarion. (Deft. Admissions ¶13). Both agreements were in effect during all times relevant to Plaintiff's loan. *Id.* at ¶¶5-6, 16-17.

According to Hartman, Hartwell Group was able "to essentially function on its own and control the direction of how ... to process loans." (Hartman Dep. 131:25-132:7). Clarion interviewed Hartman and verified his experience level through referrals but did not train Hartman with respect to loan origination. (DeBoest Dep. 15:2-19, Hartman Dep. 8:21-24). Clarion provided Hartman with access to its website, which offers the names of people and companies that aid in loan processing. (Ebright Dep. 44:6-23). However, Clarion does not direct its loan originators to use any particular service providers. (DeBoest Aff. ¶5). DeBoest states it is up to the loan officer to decide how he or she processes loans. *Id.* Clarion does not direct loan originators to use any particular

credit reporting agency. *Id.*; Hartman Dep. 30:6-20. Nevertheless, while originating loans for Clarion, Hartman and Bredwell were required to direct all originated loans through Clarion. (Deft. Admissions ¶¶7, 18). Loan originators receive no commission from Clarion unless they actually originate and process a loan. (DeBoest Aff. ¶7; Ebright Dep. 45:9-12). Further, Clarion does not require its loan originators to process a certain number of loans. (Ebright Dep. 45:17-19). Hartman worked purely on commission. (Hartman Dep. 16:19-23. 72:10-15; DeBoest Aff. ¶7).

For a fee, Clarion provided the software program that Hartman and Bredwell used. (Hartman Dep. 50:14-22; DeBoest Aff. ¶9). Loan documents like appraisals, titles, and loan applications that Hartman and Bredwell used were produced from this software program. (Hartman Dep. 53:19-25). Hartman created the forms using Clarion's logo. *Id.* at 96:11-16, 104:21-105:8. For example, Hartman created his business fax cover sheet using Clarion's logo by cutting the logo from Clarion's website and pasting it onto a cover sheet template. *Id.* at 56:25-57:9. Similar to the software arrangement, Clarion authorized Hartman and Bredwell to carry Clarion business cards stating they were loan officers, but Hartman paid for the cards. (DeBoest Dep. 17:18-18:12; Doc. #45, Ex. 4). Hartman paid a fee for permission to use Clarion's name and logo. (DeBoest Aff. ¶9; DeBoest Dep. 18:9-12). He also paid to use a Clarion email address, "rhartman@clarionmortgage.com." (DeBoest Dep. 18:20-19:1; DeBoest Aff. ¶9; Doc. #45, Ex. 4).

Hartman did not work out of Clarion's local office at 10740 Nall Avenue, Overland Park, Kansas, although he did occasionally have borrowers meet him at the Clarion office to sign documents. (Hartman Dep. 21:12-20, 68:20-25; DeBoest Dep. 17:10-12). Both Hartman and Bredwell's business cards nevertheless listed the Clarion address. (Doc. #45, Ex. 4).

7

Plaintiff was not familiar with the names of originators Hartman and Bredwell or who employed them. (Walter Dep. 29:4-10). She knew that two people she had been told were from Clarion came to her door to fill out paperwork for a loan. *Id.* at 60:22-61:3. Bredwell signed the loan application on Plaintiff's loan as "Interviewer" and next to his signature the application provides space for the "Name and Address of Interviewer's Employer" and goes on to list Clarion along with its Nall Avenue address in Kansas under that heading. (Doc. #45, Ex. 12). Clarion's Mortgage Brokerage Business Contract with Plaintiff states that Clarion was acting as Plaintiff's agent in securing a mortgage commitment. (Doc. #45, Ex. 13).

A mortgage underwriter reviews a loan application and provides the underwriting decision; Clarion is not an underwriter and did not make the decision to fund Plaintiff's loan. (DeBoest Dep. 63:24-64:20). Plaintiff testified at her deposition that she does not think Clarion made any false statements to her with regard to her loan. (Walter Dep. 42:20-43:25, 44:1-49:18). Later in her Amended Petition and affidavits, Plaintiff alleges that Hartman had represented that the builder would not be paid until the work on her property was completed and that this representation was material to her deciding to seek her loan through Clarion. (Am. Pet. ¶¶29, 36; Walter Aff. ¶¶12, 17). In fact, the contractor's check #91063 was picked up from the title company by a Clarion loan officer, either Hartman or Bredwell, on the day it was written, November 10, 2004, and deposited that same day in the contractor's bank account. (Shippy Dep. 122:18-25; Shippy Aff. ¶11; Doc. #45, Ex. 16). Plaintiff signed a letter dated November 2, 2004 stating that she was "aware that the cash out funds for [her] home improvement loan [would] be paid directly to KC Builders." (Doc. #39, Ex. 14).

8

The closing document preparer found nothing out of the ordinary with Plaintiff's loan. (Ebright Dep. 42:3-7). Plaintiff's loan expert testified that the closing documents were properly completed, the interest rate was proper along with the loan-to-value and debt-to-income ratios and the commission paid to Clarion. (Wooding Dep. 58:9-16, 78:6-15, 177:15-25, 178:6-25, 185:1-6, 187:3-9). Heather Shippy ("Shippy"), as the closer and settlement agent, testified that she swore to the best of her knowledge that "the HUD-1 settlement statement which [she prepared was] a true and accurate account of the funds which were received and have been or will be disbursed ... as part of the settlement of this transaction." (Shippy Dep. 29:23-30:8). However, KC Builders also cut a check for $2,500.00, dated November 10, 2004, made out to the Hartwell Group. (Doc. #45, Ex. 7). Plaintiff's name, "Walter", was written in the memo section of the check. *Id.* Hartman exercised his Fifth Amendment right with respect to questions about the $2,500.00 payment. (Hartman Dep. 107:24-108:6). Phelps exercised his Fifth Amendment right with respect to questions about his dealings with Hartman and Bredwell, with Clarion, and with respect to the $2,500.00 payment. (Phelps Dep. 57:23-58:2, 85:12-25, 86:1-4, 88:11-23, 94:1-21). He also exercised his Fifth Amendment right with respect to his receipt of $13,500 of the loan proceeds at closing. (Phelps Dep. 94:1-21).

Between August 2004 and July 2005, KC Builders referred at least twenty other loans to Hartman and Bredwell. (Hartman Dep. 25:11-19, 106:15-107:2; Shippy Aff. ¶¶12-14). On each of these loans, KC Builders was paid directly from the loan, Hartman or Bredwell picked up the check on the date it was written, and KC builders deposited the funds in its account within three days. (Shippy Aff. ¶15-17). During the period in which these 20 loans were made, Hartman and Bredwell received related and unexplained payments from KC Builders. (Doc. #45, Ex. 20). DeBoest

9

testified he had no knowledge of payments between KC Builders and Hartman and Bredwell but acknowledged that if they occurred in the manner alleged they would be a violation of RESPA. (DeBoest Dep. 60:1-61:2). Shippy stated in an affidavit that she issued the $13,500.00 check at closing to KC Builders pursuant to instructions she received from Clarion. (Shippy Aff. ¶7).

KC Builders performed some of the work on the property, but Plaintiff believes it was not performed as promised in the contract. (Walter Dep. 117:1-7). Plaintiff states the work that was to be done on her home in association with the loan did not begin until after KC Builders was paid and that the work was never completed. (Walter Aff. ¶¶12, 17; Am. Pet. ¶51; Walter Dep. 117:1-7, 29:25-30:21). Plaintiff's expert, Mark Heinze, has stated in an affidavit that the value of the work done on Plaintiff's home by Phelps was zero. (Heinze Aff. ¶8). The instant lawsuit was filed, according to Plaintiff, because KC Builders did not complete the work and would not have been filed if the work had been done properly. (Walter Dep. 29:25-30:21). Plaintiff testified she wanted this lawsuit to result in her home being "fixed like it was supposed to have been." *Id.* at 37:8-13.

Pursuant to the scheduling order in this case, discovery closed on December 15, 2008. (Doc. #26). The scheduling order required Plaintiff to disclose her experts by September 12, 2008. *Id.* Disclosed experts were to submit affidavits including, among other things, their opinions to be expressed, the reasons and bases for the opinions, and the data or information considered in forming the opinions. *Id.* Plaintiff has not disclosed an expert with regard to her RESPA claim.

## II.   Standard

Rule 56 states summary judgment should be granted if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

Case 4:08-cv-00536-GAF   Document 48   Filed 04/02/09   Page 10 of 21

Fed. R. Civ. P. 56(c). Genuine issues of material fact remain if sufficient evidence exists for a reasonable jury to find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court reviews the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).

The moving party bears the initial burden of showing no genuine and material fact disputes remain. *Id*. If successful, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To show a genuine and material fact issue exists, the nonmoving party must go beyond the pleadings and allege specific facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1988). "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972) (*citing First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-90 (1968)). A district court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Gant v. United States*, 417 F.3d 1328, 1331 (Fed. Cir. 2005) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## III.    Analysis

*A. Claims Against Gunja*

Plaintiff's claim against Gunja arises under the MPA. As set forth in Mo. Rev. Stat. § 407.020.1, the MPA provides as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... in or from the state of Missouri, is declared to be an unlawful practice. Any act, use or employment declared unlawful by this

11

subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

According to the Missouri Supreme Court, "[f]or better or worse, the literal words [unfair practice] cover every practice imaginable and every unfairness to whatever degree." *Ports Petroleum Co. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. 2001). The MPA's purpose is "to preserve fundamental honesty, fair play and right dealings in public transactions." *Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo. Ct. App. 2006) (*citing State ex rel. Nixon v. Beer Nuts, Ltd.*, 29 S.W.3d 828, 837 (Mo. Ct. App. 2000)). As a supplement to common-law fraud, the MPA eliminates "the need to prove an intent to defraud or reliance." *Id.* (*citing Clement v. St. Charles Nissan, Inc.*, 103 S.W.3d 898, 899 (Mo. Ct. App. 2003)). The MPA "paint[s] in broad strokes to prevent evasion thereof due to overly meticulous definitions." *Id.* (*citing Clement*, 103 S.W.3d at 900 & *State ex rel. Webster v. Areaco Inv. Co.*, 756 S.W.2d 633, 635 (Mo. Ct. App. 1988)).

In this case, enough circumstantial evidence exists for Plaintiff to overcome summary judgment on her MPA claim against Gunja.[3] Hartman testified that Morton appraised many of the homes that Clarion financed. Morton conducted a lot of business with Hartman and had catered a Christmas lunch for Hartman for sending business Morton's way. The appraisal request directed to Morton from Hartman indicated a typewritten pre-appraisal value of $45,000. Morton's subsequent appraisal valued the property at $50,000. While the loan and credit applications Plaintiff

_____

[3]Gunja's fails to support her feeble factual assertions that Morton was an independent contractor. She is unable to show she merit's summary judgment on the issue, especially because of her admission that she reviewed Morton's appraisal reports, signed off as a supervisory appraiser, and bears responsibility for Morton's appraisal reports conducted under her supervision.

12

signed also indicated an estimated value of $45,000, Plaintiff maintained at her deposition that she had no opinion as to the value of her property.

Although Morton's pattern of business with Hartman alone does not suggest a violation of the MPA, additional evidence of irregularities exists. Morton's appraisal indicated there was a forced air furnace at the property at the time of the appraisal that was in good condition when other evidence–namely Plaintiff's testimony, the contract with KC Builders calling for installation of a furnace, and Morton's field notes–indicates the property had no functional heating system. This evidence, compounded with the sweeping language of the MPA and the requirement that the Court draw all reasonable inferences in favor of the non-moving party, shows disputed facts that would support a reasonable jury's verdict in Plaintiff's favor.

Gunja assails the element of causation, claiming even if Morton's action constituted an unfair practice there is no evidence Plaintiff was harmed by Morton's activities. However, the record reflects otherwise. Sufficient evidence exists to show the appraisal was a prerequisite to approval of Plaintiff's loan and that the resulting approval and disbursement of funds caused Plaintiff's property to be encumbered by a loan for which she did not receive full value. The alleged facts and the record show a motive for Morton to submit appraisal numbers that would assure the loan's approval regardless of the property's actual value in order to secure more business from Hartman and Bredwell. Further, the MPA's language is broad. The fact that KC Builders was the party tasked with performing the work on the property does not break the causal connection between the appraisal and Plaintiff's alleged harm, especially in light of Morton's association with Hartman, the inconsistency between Morton's notes on the furnace and his appraisal, and the evidence showing a predetermined value may have been assigned to the property. In short, there is sufficient evidence

13

to show Plaintiff's alleged damages were the natural and probable consequence of Morton's actions combined with the actions of Hartman and Phelps in a continuous sequence. *See Mprove v. KLT Telecom, Inc.*, 135 S.W.3d 481, 490 (Mo. Ct. App. 2004) (discussing the causation standard for common law fraudulent misrepresentation). Each parties' action was a necessary element leading to Plaintiff's alleged damages. Gunja's Motion for Summary Judgment is therefore DENIED.

B.    *Claims against Clarion*

As its first line of defense, Clarion asserts it cannot be liable for the actions of Hartman and Bredwell because Hartman and Bredwell were independent contractors at the time the alleged events occurred. Missouri courts have considered the following factors in determining whether a party is an employee or independent contractor:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer;
>
> (i) whether or not the parties believe they are creating the relation of master and servant; and
>
> (j) whether the principal is or is not in business.

14

*Bargfrede v. Am. Income Life Ins. Co.*, 21 S.W.3d 157, 162 (Mo. Ct. App. 2000) (*citing Carter v. Wright*, 949 S.W.2d 157, 160 (Mo. Ct. App. 1997) (applying factors from the RESTATEMENT (SECOND) OF AGENCY)).

In this case, the evidence reveals that issues of material fact remain with respect to whether Hartman and Bredwell were independent contractors or employees. The loan originator agreements state that Hartman and Bredwell were to work "under Clarion's direction and control." "[T]he determining factor is not whether [the alleged employer] actually exercised control over the work ... [but] whether [it] had the right to exercise that control." *Bargfrede*, 21 S.W.3d at 162 (citation omitted). Despite granting Hartman and Bredwell significant autonomy, Clarion required them to refer loans to Clarion and there is no evidence Hartman and Bredwell did simultaneous work for other companies in addition to Clarion. Clarion provided Hartman and Bredwell with an email address, use of Clarion's logo, software, web resources, and occasional use of the Clarion office. Even if Hartman and Bredwell paid Clarion for some of these resources, they were intended for, and used by, Hartman and Bredwell to present themselves as agents of Clarion through business cards, email addresses, and loan application forms. The evidence also suggests Hartman and Bredwell were personally licensed through Clarion and their separate S Corp, Hartwell Group, had no brokerage license at the time the loan was made to Plaintiff that would have allowed Hartman and Bredwell to operate independent of Clarion or some other licensed broker. Further, the origination and brokerage of the loan are closely linked and Clarion's business depends upon the work of its loan originators. Hartman and Bredwell were not providing a temporary or unrelated service in relation to Clarion's business.

Although the commission compensation, Hartman's separate office, absence of tax withholdings, and the stated intent of the parties are relevant, sufficient evidence exists to support a reasonable jury's finding that Hartman and Bredwell acted as employees of Clarion. None of the relevant considerations for determining employee/independent contractor status is conclusive, *Bargfrede*, 21 S.W.3d at 162 (citation omitted), and "[i]f there is uncertainty arising either from conflict in the testimony or because the undisputed facts may lead reasonable men to draw different conclusions as to whether the employee was such and acting in the scope and course of his employment, the question becomes not one of law but of fact to be settled by the jury." *Carter v. Wright*, 949 S.W.2d 157, 159 (Mo. Ct. App. 1997) (*citing Smoot v. Marks*, 564 S.W.2d 231, 236 (Mo. Ct. App. 1978)). Here, uncertainty exists and enough evidence of an employee/employer relationship exists to create a submissable case.

In addition, a reasonable jury could conclude Hartman and Bredwell were acting within the course and scope of their employment with respect to Plaintiff's loan. The loan originator agreements were in force at the time of the loan and directed Hartman and Bredwell to "solicit, originate, process and facilitate the closing and post-closing of residential real estate mortgage loans." (Doc. #45, Ex. 1, p. 1). "A principal is liable vicariously for his agent's acts if the principal manifests his consent to, or knowingly permits, the agent's exercise of authority, and if the third party believed, with a reasonable, good faith basis for doing so, that the agent had authority and relied on the agent's apparently having authority to act." *Premium Fin. Specialists, Inc v. Hullin*, 90 S.W.3d 110, 113 (Mo. Ct. App. 2002) (*citing Hefner v. Dausmann*, 996 S.W.2d 660, 667 (Mo. Ct. App. 1999)). Here, Clarion authorized Hartman and Bredwell to present themselves to the public under Clarion's auspices through forms, business cards, email addresses, and occasional office use.

16

Whether the actions of Hartman and Bredwell were fraudulent or personally motived does not insulate Clarion, particularly because Clarion benefitted from its participation in processing Plaintiff's loan and immediately sold the loan to the underwriter. *See Premium Fin. Specialists*, 90 S.W.3d at 113 ("When a principal cloaks his agent with apparent authority, the principal can be vicariously liable to wronged third parties even when the agent acts wholly out of personal motive or with the purpose of defrauding his principal and even when the principal is innocent and deprived of any benefit.") (*citing* the RESTATEMENT (SECOND) OF AGENCY § 249, cmt. a.).

Having established that sufficient evidence exists to avoid summary judgment on the issue of agency, Plaintiff also succeeds in presenting a triable issue on her MPA claim against Clarion. Under the MPA authority cited above, the record would support a jury's finding that Hartman and Bredwell engaged in an unfair practice with respect to Plaintiff. The existence of the $2,500 check written on KC Builders' account to Hartwell Group on the same day Plaintiff's loan was disbursed, and with Plaintiff's name in the memo line, strongly suggests deception and fraud. Further, the arrangement that provided for payment to KC Builders contingent on the closing date of the loan rather than on completion of the work appears at best questionable and at worst duplicitous. Even if legally relevant, Plaintiff's acknowledgment that KC Builders would be paid directly from the loan proceeds does not establish she agreed the payment would be made prior to the work's completion or provide legal justification for Hartman and Bredwell's acceptance of the alleged illegal gratuity payment from KC Builders. Finally, Clarion's argument that causation is lacking between Plaintiff's damages and Hartman and Bredwell's actions fails for the same reasons Gunja's argument on causation fails. Clarion's Motion for Summary Judgment on Plaintiff's MPA claim is therefore DENIED.

17

With respect to the RESPA claim against Clarion, Plaintiff again presents sufficient evidence to overcome summary judgment. The kickback/referral/split fee provision of RESPA provides as follows:

(a) Business referrals

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).

According to 24 C.F.R. § 3500.14(e),

[a]n agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

The record reflects evidence that Phelps referred Plaintiff to Clarion for her loan. There is also evidence, in the form of Plaintiff's testimony, that shows KC Builders received payment for the work to be done on Plaintiff's property, if not before the work commenced, before the work was completed. In either instance, the alleged facts make it appear KC Builders received early payment in exchange for the referral. Although Clarion disputes whether the work was started at the time the funds were disbursed to KC Builders, Clarion cites no evidence that counters Plaintiff's assertions or shows the work had been completed at the time the funds were paid to KC Builders or any time thereafter. Thus, the alleged full pre-completion payment to KC Builders arranged by Clarion loan originators can reasonably be construed as a thing of value given as part of a federally related mortgage in exchange for Phelps' referral of Plaintiff to Clarion loan originators.

18

There is also evidence that suggests the payments were made pursuant to an agreement.  The closing and title agent stated someone associated with Clarion directed that the funds be paid contingent on the date of closing rather than on the date of the work's completion.  There is evidence of some 20 transactions involving KC Builders and Hartman where KC Builders was paid on the date funds were disbursed without reference to a contract completion date.  Hartman and Bredwell retrieved the checks from the loan officer in each case and the checks were deposited in KC Builders' account immediately.  Pursuant to the applicable regulations, there is no requirement that the parties verbalized the agreement.  It can be established through a pattern of conduct such as the record shows here.  Finally, especially in light substantial other evidence suggesting a pattern or course of illegal conduct, Hartman and Phelps' invocation of their Fifth Amendment rights justifies an inference that if they would have answered questions about their interactions and monetary exchanges truthfully, the answers would have been unfavorable to them, and thus unfavorable to Clarion, contingent on a finding that Clarion was Hartman and Bredwell's employer.  *Johnson v. Missouri Bd. of Nursing Adm'rs*, 130 S.W.3d 619, 631 (Mo. Ct. App. 2004) (citations omitted).  *See also Pagel, Inc. v. S.E.C.*, 803 F.2d 942, 946-47 (8th Cir. 1986) (Although silence alone cannot support an adverse determination, the fifth amendment "does not preclude the [negative] inference where the privilege is claimed by a party to a civil cause.") (*quoting Baxter v. Palmigiano*, 425 U.S. 308, 318-320 (1976)).

Even if Clarion could show it merits summary judgment under section 2607(a), it cannot show it is entitled to it under section 2607(b).  Section 2607(b) of Title XII of the United States Code provides that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in

19

connection with a transaction involving a federally related mortgage loan other than for services actually performed." The regulation promulgated under subsection (b) states "[a] charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(e).

Here, the evidence would support a jury's finding that the check KC Builders wrote to the Hartwell Group on November 10, 2004 in the amount of $2,500 with Plaintiff's name in the memo line was connected to the federally related loan. Further, Hartman and Bredwell were allegedly paid this amount in addition to their commission from Clarion for originating the loan. A reasonable inference can be made that the $2,500 payment was therefore duplicative, unearned, and not in exchange for any performed services. In fact, a Clarion manager admits the payment as alleged by Plaintiff would be a violation of RESPA.

Clarion contends Plaintiff cannot proceed on her RESPA claims without expert testimony and that she has not designated an expert with regard to her RESPA claim. "Expert testimony is required if a subject matter is outside the knowledge or experience of lay people." *Phillips-Foster v. UNUM Life Ins. Co. of Am.*, 302 F.3d 785, 797 (8th Cir. 2002) (*citing Sherbert v. Alcan Aluminum Corp.*, 66 F.3d 965, 967 (8th Cir.1995)). "Where the ability to make inferences and draw conclusions is within the common knowledge of a lay person, however, expert testimony is not required." *Id.*

In this case, as tested above, there is sufficient evidence in the record for the jury to affirmatively find all the elements of the RESPA violations alleged. Clarion cites no case where a court required an expert to testify on RESPA issues similar to the ones present in this case. While cases may arise under RESPA where the issues raise complex factual or legal claims that would

20

require expert testimony to establish, there appears little doubt here that if the circumstances Plaintiff alleges occurred, that they were improper and violate the plain terms of RESPA without further explanation from experts. Clarion's Motion for Summary Judgment on Plaintiff's RESPA claim is therefore DENIED.

## **CONCLUSION**

Plaintiff presents sufficient evidence to support a jury's finding that Morton's actions constituted an unfair practice under the MPA and that Gunja is liable for Morton's actions. The same is true with respect to the actions of Hartman and Bredwell and Clarion's liability for their activities under the MPA along with Clarion's alleged status as Hartman and Bredwell's employer. Finally, Plaintiff also presents sufficient evidence to establish a claim against Clarion under RESPA and the Court finds expert testimony is not required with regard to the RESPA claims presented in this case. Defendants' Motions for Summary Judgment are therefore DENIED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

DATED:  **April 2, 2009**

Case 4:08-cv-00536-GAF   Document 48   Filed 04/02/09   Page 21 of 21